## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| FGXI INTERNATIONAL, INC., <br>     Plaintiff, <br><br>     v. <br><br> PREMIER ACCESSORY GROUP, LLC, <br>     Defendant/Counterclaim <br>     Plaintiff, <br><br>     v. <br><br> FGXI INTERNATIONAL, INC., <br>     Counterclaim Defendant, <br><br>     and <br><br> FENIX SB, LLC, <br>     Third-Party Defendant. | C.A. No. 21-cv-00243-MSM-PAS |

## MEMORANDUM AND ORDER

Mary S. McElroy, United States District Court Judge.

Multi-sided rotating sunglasses racks are in stores everywhere. This case arises from a complicated contract dispute among three companies that supply and manage these racks: FGXI International, Inc., Premier Accessory Group, LLC, and Fenix SB, LLC.

FGXI makes sunglasses to sell on the racks, and it used to buy Premier's mobile accessories, like phone chargers, to sell alongside its sunglasses. But after the end of their business relationship, FGXI sued Premier, insisting that Premier had to

buy back products it had previously sold FGXI.  Premier then asserted a host of counterclaims against FGXI; it also sued Fenix, the distribution company that helped FGXI and Premier get their products into Circle K convenience stores.  Now, Fenix and FGXI each move for summary judgment on Premier's claims against them.  (ECF No. 51; No. 55.)

For the reasons below, Fenix's Motion for Summary Judgment (ECF No. 51) is GRANTED IN PART and DENIED IN PART, and FGXI's Motion for Partial Summary Judgment (ECF No. 55) is GRANTED IN PART and DENIED IN PART.

## I.    BACKGROUND

### A.    The Parties

This case revolves around a business dispute among three companies: FGXI, Premier, and Fenix.  FGXI designs, markets, and distributes sunglasses and non-prescription reading glasses.  (ECF No. 35 ¶¶ 12–13.)  It sells its products under brands like "Foster Grant" in national and regional retail chains like CVS, Walgreens, and Walmart.  *Id.*  FGXI's glasses are typically set on rotating multi-sided display racks familiar to shoppers in those stores and other retail locations throughout North America.  *Id.*  ¶ 14.  FGXI is a Delaware corporation with its principal place of business in Smithfield, Rhode Island.  *Id.* ¶ 2.

Premier designs, sources, and distributes a variety of "mobile accessory products," like cell phone chargers and headphones.  *Id.* ¶¶ 10–11.  It sells its products under brands like "Energizer" and "Eveready," as well as its own name, in

national retailers like Best Buy, Target, and Home Depot.  *Id.* ¶¶ 10–11.  Premier is a New York limited liability corporation located in Cranberry, New Jersey.  *Id.* ¶ 1.

Fenix is a distribution company that contracts with retailers to manage shelf space in stores.  *Id.* ¶¶ 34–36.  It also works with suppliers like FGXI to get products onto those shelves.  *Id.*  Fenix is an Arizona-based limited liability company that operates largely out of Phoenix.  *Id.* ¶ 3.

### B.    The Contracts

Starting in 2017, FGXI decided to expand its market into convenience stores and gas stations.  (ECF No. 61-3 at 8.)  But to make that expansion worthwhile, it concluded that it needed to put mobile accessories on the display racks alongside its sunglasses to secure a "high profit" and "high return on a square foot basis."  *Id.*  FGXI chose to partner with Premier.  *Id.*  The two companies soon created co-branded display racks—FGXI's glasses on two sides, Premier's mobile accessories on the other two—and, in January 2018, they entered into a written agreement memorializing their arrangement.  (ECF No. 61-4.)

The FGXI-Premier Agreement established that FGXI would distribute and sell Premier's products alongside its own in approved retailers throughout the country.  (ECF No. 61-4 at 1.)  It included a pricing scheme for the mobile products as well as an exclusivity provision: if FGXI displayed any mobile products alongside its sunglasses, those products had to be Premier's.  *Id.* at 1–2, 11.  And the Agreement established that FGXI would buy the products from Premier "as an independent contractor," so FGXI would sell them directly to customers only in FGXI's "own name

3

and on its own behalf." *Id.* at 2. Title for the products would thus transfer from Premier to FGXI as soon as FGXI received the products, but the Agreement also laid out circumstances where FGXI could return the products to Premier for a refund.[1] *Id.*

After several months, FGXI approached Premier with an opportunity to secure new rack placements in Circle K convenience stores, among others. (ECF No. 61-6 at 2.) To do so, the pair would need to work with Fenix, Circle K's "placement agent" that contractually controlled the store's shelf space. (ECF No. 61-2 ¶ 104.) FGXI, Premier, and Fenix then drew up two contracts—one between FGXI and Fenix and the other between Premier and Fenix. (ECF No. 61-7; No. 61-10.)

Under this arrangement, Premier would sell FGXI its products (as usual), FGXI would bundle them with FGXI's glasses and give the bundle to Fenix, and Fenix would resell all the products to customers in Circle K stores. (ECF No. 61-7 at 1; No. 61-10 at 1.) Notably, Fenix would pay FGXI only after a Circle K customer bought the product, a practice called "scan-based trading." (ECF No. 61-7 at 1, 3.) Fenix would never pay Premier directly—only FGXI would. (ECF No. 61-4 at 3; No. 61-10 at 1.) FGXI and Premier separately amended their initial contract slightly, establishing that Premier would give FGXI a 3% rebate on all Premier products sold in Circle K stores. (ECF No. 61-9 at 2.) Still, to get their products into stores in the first place, FGXI and Premier each had to pay Fenix annual "placement fees," based

---

[1] These circumstances are relevant for resolution of FGXI's claims against Premier, but not for resolution of any claims at issue in these motions.

4

largely on the number and type of racks their products would be featured in. (ECF No. 61-7 at 2; No. 61-10 at 2.)

### C.    The Problems

The arrangement started to break down the next year, purportedly when Fenix began withholding scan-based trading payments from FGXI. (ECF No. 61-12 at 1.) That in turn slowed down FGXI's payments to Premier. (ECF No. 61-5 at 21.) And because of Fenix's delinquency in payments, FGXI and Premier refused to pay their annual placement fees for the year to come. (ECF No. 61-5 at 21; No. 61-14.)

A complicated dispute ensued. It centered on whether some of the placement fees (that FGXI and Premier owed to Fenix) and the scan-based trading fees (that Fenix owed to FGXI) could offset each other. (ECF No. 61-14.) The result was that, in May 2020, Fenix terminated the Premier-Fenix Agreement because of Premier's unpaid placement fee. (ECF No. 61-26 at 2–3.) FGXI, whom Fenix still had not paid, then turned around and terminated the FGXI-Fenix Agreement only days later. (ECF No. 68-2 at 2.) But months after that, FGXI and Fenix entered into a settlement—unbeknownst to Premier. (ECF No. 68-3 at 2.) And the two supposedly struck a new deal: another company—one that Fenix's owner led—would take Premier's spot and supply the phone products needed for Circle K stores going forward. *See generally* ECF No. 66-4 at 14–16 (summarizing the dispute).

FGXI and Premier, in turn, fell into their own dispute about unpaid balances. (ECF No. 61-32; No. 61-33.) Their agreement then lapsed at the end of its term. (ECF

5

No. 58-4.)[2]  Still, one problem remained for FGXI: what to do with the rest of Premier's products that it had not yet sold.

### D.    The Lawsuits

So FGXI sued Premier.  (ECF No. 1.)  Based on their contract, FGXI primarily wants Premier (1) to accept a return of all its products that FGXI had bought and (2) to provide FGXI a full refund for these products.  *Id.*  Premier, in turn, asserts a host of counterclaims against FGXI.  (ECF No. 35.)  It also filed a third-party complaint against Fenix, arguing mainly that Fenix, not Premier, should have to buy the products.  *Id.*  After two years, discovery has closed, and FGXI and Fenix have each moved for summary judgment against Premier.  (ECF No. 51; No. 55.)  These Motions are now before the Court.

## II.    LEGAL STANDARD

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A dispute is genuine "if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party," and a fact is material "if it carries with it the potential to affect the outcome of the suit under the applicable law."  *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000).  Conversely, "factual disputes that are irrelevant or

---

[2] Premier contends that FGXI wrote a letter "terminating" the agreement in April 2021.  (ECF No. 61-2 ¶ 165 (citing ECF No. 61-33).)  But as FGXI observes, the April 23, 2021, letter did not terminate the agreement; it only put Premier on notice of an alleged breach.  (ECF No. 76 at 10.)

unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The evidence of the non-movant," here Premier, "is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255.

## III.    DISCUSSION

### A.    Governing Law

To start, the Court must determine what law governs Premier's claims. Only FGXI addresses the question head-on. (ECF No. 55 at 5–6.) It argues that Rhode Island law should govern Premier's claims against FGXI, because their Agreement expressly provides as much. (ECF No. 61-4 at 9.) Premier does not object, and it relies largely on Rhode Island law in its response brief. (ECF No. 61 at 5–6, 14.) The Court thus holds (1) that the FGXI-Premier Agreement's choice-of-law provision is enforceable and (2) that Rhode Island law governs Premier's claims against FGXI.

In the briefing related to Fenix's Motion for Summary Judgment, though, neither Fenix nor Premier directly addresses the issue. This omission matters because the three agreements relevant to these claims have three conflicting choice-of-law provisions.[3] To make matters thornier, sometimes more than one agreement is involved in the same claim.[4]

---

[3] The FGXI-Fenix Agreement provides that Delaware law governs. (ECF No. 61-7 at 5.) The Premier-Fenix Agreement provides that New York law governs. (ECF No. 61-10 at 4.) And, as already stated, the FGXI-Premier Agreement provides that Rhode Island law governs. (ECF No. 61-4 at 9.)

[4] For instance, Third-Party Count I implicates both the FGXI-Premier Agreement and the FGXI-Fenix Agreement.

That said, the parties largely use Rhode Island law in their briefs, and neither argues that a different state's law should apply nor provides guidance on a conflicts-of-law analysis.  In similar contexts, including where "the parties briefed and argued the case on the apparent understanding that Rhode Island law governs the significance of their actions and the interpretation of their agreements," the First Circuit has taken the parties' constructive agreement on the choice-of-law question as dispositive.  *In re Newport Plaza Assoc., L.P*, 985 F.2d 640, 644 (1st Cir.1993) ("When opposing parties agree to the source of the substantive law that controls their rights and obligations, and no jurisdictional concerns are present, a court is at liberty to accept such an agreement without independent inquiry.");  *Moores v. Greenberg*, 834 F.2d 1105, 1107 n.2 (1st Cir. 1987);  *Mathewson Corp. v. Allied Marine Indus., Inc.*, 827 F.2d 850, 853 n.3 (1st Cir. 1987);  *see also In re Fraden*, 317 B.R. 24, 35 n. 25 (Bankr. D. Mass. 2004) (collecting cases).  The Court thus holds that Rhode Island law governs Premier's claims against Fenix.

## B.    Fenix's Motion for Summary Judgment

Fenix moves for summary judgment on all six of Premier's third-party claims.

### 1.  Third-Party Count I: Contribution and Indemnity

First, Premier asserts claims for contribution and indemnity.  This case arose from FGXI's suit against Premier for breach of contract, where Premier is allegedly liable for failing to accept FGXI's attempted return of mobile accessory products that FGXI bought from Premier.  (ECF No. 1.)  Premier's first claim is that Fenix, not Premier, "was obligated" to buy those products back.  (ECF No. 35 ¶ 137.)

To succeed on an indemnity claim, Premier must establish (1) that it is liable to FGXI, (2) that Fenix, the "prospective indemnitor" is also liable to FGXI, and (3) as between Premier and Fenix, "the obligation ought to be discharged by" Fenix. *Wampanoag Grp., LLC v. Iacoi*, 68 A.3d 519, 523 (R.I. 2013). The "logic and rationale" of indemnity and contribution "are precisely the same," but contribution weighs the relative degree of fault among the parties, rather than shifting liability entirely. *Restatement (Third) of Restitution and Unjust Enrichment* § 23 (2011); *Hawkins v. Gadoury*, 713 A.2d 799 803 (R.I. 1998).

Fenix argues that the claim fails first because Premier has denied that it is liable to FGXI. (ECF No. 51-1 at 13.) But given that the underlying suit concerns Premier's liability to FGXI, the Court sets aside Premier's burden on that point. After all, if FGXI's claim fails, then Premier has no claim against Fenix for which it needs indemnification or contribution.

That leads to Fenix's second argument: Premier has not established that Fenix is also liable to FGXI to buy the products back. Premier, in turn, contends that three provisions of the FGXI-Fenix Agreement—Sections 10, 15, and 16—each establish Fenix's liability.

The Court disagrees with Premier. Neither § 15 nor § 16 establish Fenix's liability to FGXI to buy the products. True, § 15, titled "Term," includes a buy-back provision, but it only takes effect if the full term ends without extension or renewal; the section begins, for instance, by noting that the term can be ended "as provided elsewhere in the agreement." (ECF No. 61-7 at 4.) Applying this buy-back provision

9

in cases where the term ended early would render § 16 superfluous, as explained below. The FGXI-Fenix Agreement did not last the full term because FGXI terminated it early, so § 15's buy-back provision cannot establish Fenix's liability. (ECF No. 68-2 at 2.)

Section 16, titled "Termination," is no more helpful to Premier's case. (ECF No. 61-7 at 4.) This section lays out two paths following the dissolution of the contract. The first paragraph of § 16 provides that, in "the event of a material breach," the "non-breaching party may terminate" the Agreement with 90 days' notice. *Id.* The second paragraph of § 16 considers different circumstances: if Fenix or Circle K (1) removed products from more than fifteen percent of stores or (2) terminated the Agreement without cause before the end of the term, Fenix must pay FGXI the "value" of removed or remaining products at Circle K stores. *Id.*

But § 16 does not oblige Fenix to buy the remaining products if FGXI, rather than Fenix or Circle K, terminated the contract before the term expired. That is what happened here. (ECF No. 68-2 at 2.) True, FGXI terminated the Agreement because of Fenix's breach. *Id.* But breach alone cannot trigger § 16's buy-back provision; it only gave FGXI the option to terminate the contract, as described in the section's first paragraph.

That leaves § 10 and its amendments, which establish that FGXI must be Fenix's "exclusive supplier of sunglasses, non-prescription reading glasses, and mobile accessories to Circle K's corporate-owned stores." (ECF No. 61-7 at 3.)

Premier has presented deposition testimony showing that Fenix may have violated this provision. *See, e.g.*, ECF No. 66-4 at 14–16 (highlighting relevant testimony).

Even assuming the truth of this evidence, it fails to create a genuine issue of material fact. After all, violation of § 10 does not alone establish any buy-back liability as described in §§ 15–16. It may well constitute a material breach, giving FGXI the right to terminate under the first paragraph of § 16, but that is wholly different from the circumstances where Fenix would need to buy the products. Without proving Fenix's liability on this issue, Premier's indemnity claim necessarily fails. And because damages that Fenix owes FGXI for breaching the exclusivity agreement are apples-and-oranges to buy-back related damages that Premier owes FGXI, there is not a "common burden" between Fenix and Premier—as is necessary for a contribution claim. *See, e.g.*, *A & B Const., Inc. v. Atlas Roofing & Skylight Co.*, 867 F. Supp. 100, 105 (D.R.I. 1994) ("The doctrine of contribution requires that persons under a common burden bear responsibility in equal proportion to fault so that one party shall not be burdened more than his just share to the advantage of his co-obligors.").

The Court thus grants summary judgment for Fenix on Third-Party Count I.

### 2.    Third-Party Count II: Conversion

Second, Premier alleges that Fenix improperly retained $412,430 that it owed FGXI (and ultimately Premier) for goods sold and that Fenix improperly refused to credit that $412,430 towards Premier's placement fee. (ECF No. 35 ¶ 139–45.) And Premier alleges that Fenix turned around and claimed it never received Premier's

11

placement fee, that Fenix used this alleged nonpayment "as a pretext for cancelling the Circle K product placement venture," and that Fenix's actions amount "to conversion of those funds." *Id.* ¶ 145.

To sustain an action for conversion, Premier must prove ownership or a possessory interest in the money at issue. *DeChristofaro v. Machala*, 685 A.2d 258, 262 (R.I. 1996). "The gravamen of an action for conversion lies in the defendant's taking the plaintiff's personalty without consent and exercising dominion over it inconsistent with the plaintiff's right to possession." *Id.* In other words, "the focus of inquiry is whether" Fenix "has appropriated to his or her own use the chattel of another without the latter's permission and without legal right." *Id.* (cleaned up).

But because this is a conversion action for money, there is more. The Rhode Island Supreme Court has held that the "question of whether money can be the subject matter of an action for conversion generally depends on whether the defendant is under any obligation to deliver specific money to the plaintiff." *DeChristofaro*, 685 A.2d at 263. In *DeChristofaro*, conversion did not occur when the defendant had no obligation to keep money "intact and not mingled with his own funds"; the defendant did not have that obligation precisely because the parties' contract did not require him "to keep intact in specie the money paid by plaintiffs." *Id.* The plaintiff in a conversion action for money, the Court explained, "must demonstrate a property interest in specifically identified property" to preserve "the historic distinction" between tort and contract actions. *Id.* at 263–64. Otherwise, any breach of contract action could double as a conversion claim.

12

Premier's conversion claim fails for two reasons. First, Fenix had no contractual obligation to pay Premier, so Premier lacks the necessary possessory interest in the money at issue. *Id.* at 263. The Premier-Fenix Agreement and the FGXI-Premier Agreement make clear that FGXI, not Fenix, was responsible for paying Premier. *Cf. DeChristofaro*, 685 A.2d at 263 ("Here the contract placed no obligation upon defendant to keep intact in specie the money paid by plaintiffs.") Recall that title in the mobile accessories shifted from Premier to FGXI as soon as FGXI received the products. (ECF No. 61-4 at 2.) So if Premier lacked title to the mobile accessories once they were in Circle K stores, how could it have an interest in the payments Fenix owed FGXI once those products were sold there?

And even if Fenix had a possessory interest in the payments, another fatal problem remains. Fenix owed payments to FGXI, not Premier, so any money ultimately owed to Premier—through FGXI—was not specifically segregated enough to satisfy *DeChristofaro*. Premier's evidence to the contrary is unconvincing. For instance, citing Fenix's spreadsheet, Premier explains that "netting [one number] with [another] yields the $412,430 acknowledged universally to be Premier's second-year placement fee." (ECF No. 66-4 at 20.) But that money was a part of a larger balance Fenix withheld from FGXI, and it was already "mingled" with money Fenix owed FGXI. 685 A.2d at 263. That spoils the conversion claim.

The Court thus grants summary judgment for Fenix on Third-Party Count II.

### 3. Third-Party Count III: Breach of Contract

Third, Premier asserts—as a third-party beneficiary—a breach of the FGXI-Fenix Agreement. (ECF No. 35 ¶ 155.) Because Fenix refused "to purchase back the amount of the product inventory remaining in the Circle K stores at the termination of the agreement" and left FGXI (and thus Premier) with the products (and thus the bill), Premier argues that Fenix is liable to Premier as a beneficiary of the contract.

The central issue here is whether Premier can establish that it was an intended third-party beneficiary of the FGXI-Fenix Agreement. *See, e.g.*, *Hexagon Holdings, Inc. v. Carlisle Syntec Inc.*, 199 A.3d 1034, 1039 (R.I. 2019) ("In order to prevail on a contract claim as a third-party beneficiary, the claimant must prove that he or she is an *intended* beneficiary of the contract.") The Rhode Island Supreme Court looks to the *Restatement (Second) of Contract* to define an intended beneficiary. *Id.* So "a beneficiary of a promise is an intended beneficiary" when "recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties" and either "(a) the performance of the promise will satisfy an obligation of the promisee [here, FGXI] to pay money to the beneficiary [here, Premier]; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *Restatement (Second) Contracts* § 302 (2024).[5]

---

[5] The FGXI-Fenix Agreement states that Delaware law governs (ECF No. 61-7 at 5), but neither party referenced it in its arguments on Third-Party Counts IIII or IV. That makes little difference here, though, because Delaware's approach to third-party beneficiaries, like Rhode Island's approach, focuses largely on the parties' intent. *See, e.g.*, *Crispo v. Musk*, 304 A.3d 567, 573 (Del. Ch. 2023).

Fenix argues that none of those requirements are satisfied. First, the plain language of the FGXI-Fenix Agreement did not express an intent to benefit Premier; second, Fenix did not terminate the agreement, so liability was not triggered under the contract; and third, the performance Premier wants does not "satisfy an obligation" of FGXI to pay Premier. (ECF No. 51-1 at 15–17.)

But the relevant circumstances—both the FGXI-Fenix Agreement itself and all three parties' intertwined business dealings—raise material factual questions about FGXI and Fenix's intent to make Premier a third-party beneficiary of the contract. To start, the FGXI-Fenix Agreement deals with the sale of mobile accessories, which Fenix knew FGXI would source from Premier. (ECF No. 61-7 at 1 (explaining that FGXI will sell, among other things, "mobile products approved by the Customer")). And there is a key difference between this case and the *Restatement* example cited by Fenix to show that Premier is only an incidental beneficiary: soon after the FGXI-Fenix Agreement, Premier and Fenix created their own direct contract to memorialize Premier's role in the FGXI-Fenix Agreement. (ECF No. 66-4 at 17.) Based on its agreement to pay Fenix for purchase of Premier's products, FGXI may well have intended to give Premier "the benefit of the promised performance" between FGXI and Fenix, based on their collective arrangement. Still, the FGXI-Fenix Agreement's language gives rights and obligations only to FGXI and Fenix, and its text never explicitly mentions Premier.

All that is to say: there are "genuine issues of material fact as to whether the circumstances surrounding the formation of a contract support the third-party

15

beneficiary claim." *See, e.g.*, *Hayes v. CRGE Foxborough, LLC*, 167 F. Supp. 3d 229, 245 (D. Mass. 2016) (collecting cases denying summary judgment on the same issue).

The Court thus denies summary judgment for Third-Party Count III.

### 4. Third-Party Count IV: Breach of the Implied Duty of Good Faith and Fair Dealing

Fourth, Premier alleges a breach of the implied duty of good faith and fair dealing against Fenix, based on its conduct under the FGXI-Fenix Agreement and the Premier-Fenix Agreement. (ECF No. 35 ¶¶ 156–65.)

"[V]irtually every contract contains an implied covenant of good faith and fair dealing between the parties." *Centerville Builders, Inc. v. Wynne*, 683 A.2d 1340, 1342 (R.I. 1996) (cleaned up); *see also Dovenmuehle Mortg., Inc. v. Antonelli*, 790 A.2d 1113, 1115 (R.I. 2002). "This implied covenant provides a safeguard so that contractual aims are satisfied and parties do not act to destroy or injure the right of the other party to receive the fruits of the contract." *Premier Home Restoration, LLC v. Fed. Nat'l Mortg. Ass'n*, 245 A.3d 745, 750 (R.I. 2021) (cleaned up). But "the implied covenant of good faith and fair dealing does not create an independent cause of action, but must be connected to a breach-of-contract claim." *Id.* (cleaned up).

Because the Court has found that there is a material dispute of genuine fact about Premier's status as an intended third-party beneficiary of the FGXI-Fenix Agreement, summary judgment is inappropriate on this claim.

Going forward, the scope of this claim is limited in two important ways. First is that the breach must be tied to the FGXI-Fenix Agreement, because Premier has not alleged a predicate breach-of-contract claim based on the Premier-Fenix

16

Agreement. It admits as much. (ECF No. 66-4 at 18 ("Premier does not herein maintain a direct breach-of-contract claim against Fenix …").) It is well-established that a "breach of the covenant of good faith" claim "must be connected to a breach-of-contract claim," and Premier's only breach-of-contract claim arises from its status as a potential third-party beneficiary of the FGXI-Fenix Agreement. *EDC Inv., LLC, v. UTGR, Inc.*, 275 A.3d 537, 545 (R.I. 2022); *see also B.R.S. Real Est., Inc. v. Certain Underwriters at Lloyd's, London*, 110 F.4th 442, 449 (1st Cir. 2024) (applying Rhode Island law to dispose of an implied covenant claim "simultaneously" with its predicate breach-of-contract claim). So Count IV rises or falls with Count III.

Second, even if Premier succeeds on the claim, damages will be limited. Under the FGXI-Fenix Agreement, neither party is liable "for any form of indirect, special, consequential, or punitive damages, including … loss of revenue, and loss of profits." (ECF No. 61-7 at 6.) As a beneficiary standing in FGXI's shoes, any damages Premier can recover against Fenix are also limited by the contract, so long as the limitation is enforceable. The Rhode Island Supreme Court has upheld similar clauses narrowing liability—as well as clauses wholly excluding liability—so long as the clause is "sufficiently specific." *R.I. Hosp. Tr. Nat. Bank v. Dudley Serv. Corp.*, 506 A.2d 1325 (1992). In other words, the intention to limit damages must be "clearly and unequivocally expressed in the contract." *Id.* Here, it is.

The Court thus denies summary judgment on Third-Party Count IV but holds (1) that Count IV's scope is limited to breaches arising from the FGXI-Fenix

Agreement and (2) that, even if Count IV succeeds, damages are restricted according to the FGXI-Fenix Agreement's terms.

### 5.    Third-Party Count V: Tortious Interference with Contract and Prospective Business Relations

Fifth, Premier alleges (1) that Fenix's "unprofessional and wrongful conduct caused Premier" to lose business relationships with FGXI and other suppliers and (2) that its conduct amounts to tortious interference, with both the FGXI-Premier contract and Premier's future business relations.  (ECF No. 35 ¶ 166–76.)

"To prevail on a claim of tortious interference with contractual relations," Premier "must show (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his [or her] intentional interference; and (4) damages resulting therefrom." *Tidewater Realty, LLC v. State*, 942 A.2d 986, 993 (R.I. 2008) (cleaned up).  Further, Premier "must allege and prove not only that the putative tortfeasors intended to do harm to the contract but that they did so without the benefit of any legally recognized privilege or other justification." *Belliveau Bldg. Co. v. O'Coin*, 763 A.2d 622, 627 (R.I. 2000); *see also Nissensohn v. CharterCARE Home Health Servs.*, 306 A.3d 1026, 1038 (R.I. 2024) (applying this standard).

And to sustain a claim for tortious interference with future business relationships, Premier must show "(1) the existence of a business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an intentional act of interference, (4) proof that the interference caused the harm sustained, and (5) damages to the plaintiff." *Hum. Servs. Consultants, Ltd. v. Tamule*, No. CV 06-0486ML, 2008 WL 11390850, at *3 (D.R.I. June 30, 2008).

Premier must also show that it at least possessed a "probable future business relationship anticipating a reasonable expectancy of financial benefit." *Id.*

Premier has largely failed to demonstrate loss of prospective business. At deposition, Premier's representative pointed to several customers lost because of Fenix's conduct, including "Stewart's, Ivy, Food Lion," and "Fleet Farm." (ECF No. 53-4 at 24.) But later in the deposition, he stated that "Premier sold the product to FGX[I]," and FGXI, "in turn, sold those products to those customers" and that FGXI "was dealing with those customers." *Id.* at 33. He also said that Premier itself did not have "any specific business dealings … for potential contracts or sales" at Ivy's, Stewart's, Food Lion, Circle K, or Town and Pump. *Id.* at 34. That's because "these [were] all customers brought on [by] FGX[I]." *Id.* at 35. Absent its own dealings with these businesses—and even interpreting this evidence in favor of Premier—it is impossible to conclude that there was a "probable future business relationship anticipating a reasonable expectancy of financial benefit," as is required. *Tamule*, 2008 WL 11390850, at *3 (D.R.I. June 30, 2008). Premier's own witness practically stated as much.

Still, one business relationship is—at least at first blush—a closer call: Premier's relationship with FGXI. Recall that Fenix explained that it withheld money to FGXI that FGXI ultimately owed Premier over nonpayment of the fees. (ECF No. 61-14.) Premier argues that the controversy over withholding payments ultimately led to the end of its involvement in Circle K ventures and even its relationship with FGXI.

19

But that is not enough to hold Fenix liable. Premier barely connects Fenix's conduct to important elements of either claim brought under this count. *See, e.g.*, ECF No. 66-4 (Premier's Br. Opposing Summary Judgment) at 20–21 (providing no caselaw and minimal citation to the record to support the claim that Fenix's conduct "in-part lead [*sic.*] to the disintegration of the FGXI-Premier business relationship").

For "interference with prospective business" purposes, Premier fails to show Fenix's behavior "caused the harm sustained," the end of Premier's relationship with FGXI. *Tamule*, 2008 WL 11390850, at *3. After all, Premier and FGXI continued to do business for several more months; their Agreement petered out at the end of its term.[6] And in any event, Premier fails to show how Fenix's allegedly disruptive conduct for one set of stores led to the total collapse of the FGXI-Premier Agreement that spanned beyond Circle K's walls.

Similarly, for "interference with contract" purposes, Premier does not show that Fenix's actions caused damages related to the Premier-FGXI relationship. (ECF No. 66-4 at 20–21.) Fenix's conduct literally led to the end of the Premier-Fenix Agreement, of course, but a party cannot tortiously interfere with its own contract. And again, Premier fails to show anything suggesting that the FGXI-Premier Agreement fell apart because of Fenix's behavior.

The Court thus grants summary judgment for Fenix on Count V.

---

[6] Recognizing this, Premier observes, "Regardless of the remainder of the term of the FGXI-Premier Distribution Agreement," FGXI's termination of the agreement "at the very least" operates to "prevent summary judgment." (ECF No. 66-4 at 20.) It is not at all clear why.

### C.    FGXI's Motion for Partial Summary Judgment

Next, the Court addresses FGXI's Motion for Partial Summary Judgment. FGXI first moves for summary judgment on all of Premier's counterclaims that involve an alleged joint venture, including Counterclaim Counts II, IV, V, and VI. (ECF No. 55 at 6–11.) Second, FGXI moves to limit damages: Premier cannot recover damages based on "lost or anticipated profits, incidental, punitive, exemplary special, reliance, or consequential damages," FGXI submits, because Premier signed a limitation of liability in its contract with FGXI. *Id.* at 11–13. The Court considers these arguments in turn.

### 1.    Counterclaims II, IV, V, and VI: Joint Venture Claims

First, Premier alleges that it and FGXI entered a joint venture to get into Circle K stores, that FGXI knew that Circle K stores were not really "interested in selling" Premier's products, and that FGXI induced Premier into paying Fenix the placement fee anyway. (ECF No. 35 ¶ 85.) From this premise, Premier asserts a breach of the joint venture, and it uses the alleged breach of joint venture as partial cause for liability under other claims, as well. *Id.* ¶¶ 110–11, 127–28.

Under Rhode Island law, a joint venture is "an undertaking by two or more persons jointly to carry out a single business enterprise for profit." *Fireman's Fund Ins. v. E. W. Burman, Inc.*, 391 A.2d 99, 101 (1978). "Put differently," it is "a partnership but … limited to a single enterprise or transaction." *Med. Grp. Fin. Serv. Inc. v. U.S. Life. Ins.*, 350 F. Supp. 298, 302 (D. Mass 2003) (applying Rhode Island law). A joint venture exists when the parties are "bound by express or implied

contract" that establishes "(1) a community of interests, and (2) joint or mutual control, that is, an equal right to direct and govern the undertaking." *McAleer v. Smith*, 860 F. Supp. 924, 943 (D.R.I. 1994). Moreover, the agreement "must provide for a sharing of losses as well as profits." *Id.*

FGXI's argument against finding a joint venture is two-fold. First, the only written agreement between FGXI and Premier, the FGXI-Premier Agreement, did not establish an express joint venture; it even explicitly disclaimed one. (ECF No. 55 at 8–9.) Second, any conduct after that Agreement failed to show that Premier and FGXI established an implied joint venture; no facts establish that the parties could either "jointly control the relationship or management of the business stemming from the relationship" or "share profits and losses stemming from the relationship or enterprise." *Id.* at 9–11.

Premier, in turn, argues (1) that the FGXI-Premier Distribution Agreement did not preclude the later formation of a joint venture and (2) that FGXI and Premier's actions "with respect to securing entry into the Circle K and On-the-Go stores with Premier's mobile accessory products" amount to an implied joint venture. (ECF No. 35 ¶ 76.)

FGXI has the better of the argument. To start, there is not an express joint venture. The FGXI-Premier Agreement states that it does not "establish a joint venture or partnership." (ECF No. 61-4 at 2.) That language reflects the parties' intent not to create a joint venture. *See, e.g.*, *University of Rhode Island Bd. of Trustees v. Hellenic Soc'y Paideia – Rhode Island Chapter*, 316 A.3d 1265, 1271 (R.I.

22

2024) (upholding an arbitrator's determination that parties did not create a joint venture when the arbitrator in part "relied on language from the lease agreement explicitly stating" as much). After all, "where the language of a contract is clear and unambiguous, the Rhode Island Supreme Court has generally interpreted the parties' intent based solely on the written words." *In re Newport Plaza Assc., L.P.*, 985 F.2d 640, 645 (1st Cir. 1993).

And the parties reaffirmed that part of the Agreement twice even after they began to work on the Circle K enterprise. (ECF No. 61-9 at 1 (explaining that, unless amended, "the provisions of the [FGXI-Premier] Agreement shall remain in full force and effect"); No. 61-11 at 1 (same)). The Agreement and its repeated reaffirmations preclude any finding that there was an express joint venture and strongly caution against finding an implied one.

Premier and FGXI's actions only confirm what their Agreement plainly stated. There are insufficient facts surrounding their entry into Circle K stores to lead a reasonable jury to conclude that an implied joint venture arose. While there is evidence supporting the first of three requisite elements, a "community of interests," there is not enough for a reasonable jury to find that the parties had "joint or mutual control" or that they intended to share profits and losses.

First, a community of interests. A "community of interests" is "an interest common to both parties," or, in other words, "a mixture of identity of interest in a venture in which each and all are reciprocally concerned and from which each and all

23

derive a material benefit and sustain a mutual responsibility." 48A C.J.S. *Joint Ventures* § 11.

There is enough evidence to show that the parties' endeavor into Circle K stores amounted to a common interest. Four examples show the point. First, FGXI pitched the Circle K venture to Premier as a joint enterprise. (ECF No. 61-5 at 5.) It described Premier as its "Mobile Accessories partner," and it explained that Premier's participation was integral to the plan's success: Premier's "mobile accessories are key to the program," because "they outsell sunglasses by a 2-1 ratio." (ECF No. 61-6 at 2.) Second, FGXI and Premier amended their initial agreement specifically to establish that FGXI would get a special rebate from Premier only for Circle K sales, showing the unique nature of this project as compared to their others. (ECF No. 61-9 at 2.) Third, the parties each contracted with a new party, Fenix, specifically to get onto the same display racks in Circle K stores. (ECF No. 61-7; No. 61-10.) And the fourth and perhaps clearest illustration of the shared interests are the display racks themselves, where FGXI and Premier's products were sold side-by-side after each contracted with Fenix.

But Premier fails to show sufficient evidence for the second and third elements. Consider joint control, the second element. To establish this element, Premier must show that "each party [had] an equal right to direct and govern the movements and conduct of each other with respect thereto and must have some voice and right to be heard in its control or management." 48A C.J.S. *Joint Ventures* § 12.

24

Here is where Premier's claim falls short.  Premier and FGXI did not have the power to direct and govern each other's operations in the Circle K venture.  The FGXI-Premier Agreement established that FGXI would buy products from Premier "as an independent contractor and sell the products to customers in its own name and on its own behalf."  (ECF No. 61-4 at 2.)  The Agreement also made clear that FGXI had "no power or authority to assume, create, or incur any liability or obligation of any kind … on behalf of Premier."  *Id.*  And although the parties did modify one part of the Agreement in figuring out the Circle K arrangement, these clauses defining their relationship remained intact throughout the deal.  (ECF No. 61-9 at 1 (explaining that, unless amended, "the provisions of the [FGXI-Premier] Agreement shall remain in full force and effect"); No. 61-11 at 1 (same)).  Aside from the rebate, nothing about the working arrangement changed when they entered Circle K stores.

Moreover, each party independently contracted with Fenix regarding its products' placement.  (ECF No. 61-7; No. 61-10.)  In a footnote, Premier suggests that this fact proves joint control, but the Court disagrees.  (ECF No. 61 at 14 n.8.)  These separate agreements show that each party lacked—rather than held—the power to manage each other's conduct related to the Circle K enterprise.  For instance, when the dispute over Fenix's late payments to FGXI arose, Premier was not obligated to withhold its placement fees to Fenix, nor could FGXI force it to do so; Premier seemed to do so out of respect for its relationship with FGXI.  And in any event, the First Circuit has "repeatedly held that arguments raised only in a footnote … are waived." *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 61 (1st Cir. 1999).

Nor is there sufficient evidence for the third element, a sharing of profits or losses. The FGXI-Premier Agreement does not establish a profits-sharing or losses-sharing system one would expect under a joint venture. *See, e.g.*, *McAleer v. Smith*, 860 F. Supp. 924, 943 (D.R.I. 1994) ("While [the parties] may have engaged in coordinated promotional activities for their mutual advantage, the record contains no evidence of any agreement to share profits and losses.") Any risk of loss on the products shifted from Premier to FGXI once the product was "received at FGX's designated ship-to location." (ECF No. 61-4 at 2.)

The Court thus grants summary judgment for FGXI on Counterclaim Count II. It also grants partial summary judgment for FGXI on Counterclaim Counts IV, V, and VI as much as those claims are based on the joint venture.

### 2.    Damages

Next, FGXI argues that if Premier establishes liability on its contract claims, any damages must be limited based on the FGXI-Premier Agreement. Premier hardly resists the point, explaining that there "is little room to argue against its applicability *within* the Distribution Agreement." (ECF No. 61 at 22) (emphasis in original). Its only argument to the contrary is that this provision does not apply to the joint venture. *Id.* But because the Court has held that there was not a joint venture between FGXI and Premier, the question then becomes whether this clause limiting liability is enforceable as a part of the FGXI-Premier Agreement.

The Rhode Island Supreme Court has upheld clauses narrowing liability and even wholly excluding liability so long as the clause is "sufficiently specific." *Dudley*

*Serv. Corp.*, 506 A.2d at 1325.  In other words, the intention to limit damages must be "clearly and unequivocally expressed in the contract."  *Id.*

And here, the clause is both specific and clear enough.  The provision states that neither party is liable for "lost or anticipated profits," or "any incidental, punitive, exemplary, special, reliance, or consequential damages."  (ECF No. 61-4 at 8.)  And in the contract, this provision is bolded and in all capital letters.  It is, as FGXI describes, "unmistakably clear."  (ECF No. 55 at 12.)

The Court thus holds that any damages Premier recovers under the FGXI-Premier Agreement must be limited based on its terms.

### D. Counterclaim Count VII/Third-Party Claim VI: Civil Conspiracy

Premier's last claim is civil conspiracy against both Fenix and FGXI.  The two allegedly "acted knowingly and in concert with each other" to the detriment of Premier.  (ECF No. 35 ¶ 178.)  They "decided to conclude the Circle K business and to assign to Premier the liability of unsold mobile accessory products," and FGXI did so even though it understood that Fenix "had no right to demand return" of the products.  *Id.* ¶¶ 179–80.

In Rhode Island, "civil conspiracy is not an independent basis of liability." *Read & Lundy, Inc. v. Washington Tr. Co. of Westerly*, 840 A.2d 1099, 1102 (R.I. 2004).  Instead, "it is a means for establishing joint liability for other tortious conduct," so it "requires a valid underlying intentional tort theory." *Read & Lundy, Inc.*, 840 A.2d at 1102 (quoting *Guilbeault v. R.J. Reynolds Tobacco Co.*, 84 F. Supp. 2d 263, 268 (D.R.I.2000)).  Put differently, "to prove a civil conspiracy," Premier must

"show evidence of an unlawful enterprise" and "the specific intent to do something illegal or tortious." *Read & Lundy, Inc.*, 840 A.2d at 1102; *Guilbeault*, 84 F. Supp. 2d at 268.

Both FGXI and Fenix have moved for summary judgment on this claim. (ECF No. 55 at 11; No. 51-1 at 17.)    FGXI argues that the claim should be dismissed because Premier has not alleged "facts separate and distinct from other claims pled" sufficient to show conspiracy and there is nothing to support "any intentional tort theory."[7]  (ECF No. 55 at 11.)  Similarly, Fenix argues that "conspiracy is not an independent basis for liability," and because Premier's only remaining tort claim against FGXI fails as a matter of law, summary judgment is appropriate.  (ECF No. 51-1 at 17.)

But for now, the civil conspiracy claim must stay because there is a "valid underlying intentional tort theory." *Read & Lundy, Inc.*, 840 A.2d at 1102 (quoting *Guilbeault*, 84 F. Supp. 2d at 268).   The Court has already held that there are no remaining tort claims against Fenix, so the only remaining tort that Premier has alleged is against FGXI: Counterclaim Count V, Tortious Interference with

---

[7] Separately, FGXI argues that, because Premier failed to object to its motion for summary judgment on this claim, FGXI is entitled to summary judgment. (ECF No. 75 at 1 n.1.)  Not so.  The First Circuit has made clear that "a moving party" is not "automatically entitled to summary judgment if the opposing party does not respond." *Jaroma v. Massey*, 872 F.2d 17, 20 (1st Cir. 1989).  Instead, Rule 56(e) requires that summary judgment shall only be granted "if appropriate." *Id.*  This Court "cannot grant a motion for summary judgment merely for lack of any response by the opposing party, since [the Court] must review the motion and the supporting papers to determine whether they establish the absence of a genuine issue of material fact." *Id.*

Prospective Business Relations.  (ECF No. 35 ¶¶ 106–122.)  Yet FGXI did not move for summary judgment on this claim, so the Court cannot adjudicate it directly.  And the Court should not "get under the hood" and evaluate the strength of Counterclaim Count V for purposes of adjudicating the civil conspiracy claim, particularly when the parties did not brief it.  Because an intentional tort theory remains unchallenged, the civil conspiracy claim cannot yet be dismissed.

The Court thus denies summary judgment for FGXI and Fenix on Counterclaim Count VII/Third-Party Count VI.

## IV.    CONCLUSION

In sum, Fenix's Motion for Summary Judgment (ECF No. 51) is GRANTED IN PART and DENIED IN PART.  Summary judgment is GRANTED as to Third-Party Counts I, II, and V, but DENIED as to Counts III and IV.  Any damages arising under Count IV will be limited based on the terms of the FGXI-Fenix Agreement.  Summary judgment as to Third-Party Count VI is DENIED.

FGXI's Motion for Partial Summary Judgment (ECF No. 55) is GRANTED IN PART and DENIED IN PART.  Summary judgment is GRANTED as to Counterclaim Count II and GRANTED to Counterclaim Counts IV, V, and VI to the extent that those claims rely on a joint venture.  Where appropriate, damages will be limited based on the FGXI-Premier Agreement's terms.  Summary judgment as to Counterclaim Count VII is DENIED.

IT IS SO ORDERED.

_____
Mary S. McElroy,
United States District Judge

February 4, 2025